1  Richard I. Dreitzer
   Nevada Bar No. 6626
2  Amanda L. Ireland, Esq.
   Nevada Bar No. 13155
3  WILSON, ELSER, MOSKOWITZ, EDELMAN &
   DICKER LLP
4  300 South Fourth Street, 11th Floor
   Las Vegas, NV  89101
5  Telephone: 702.727.1400
   Facsimile: 702.727.1401
6  Richard.Dreitzer@wilsonelser.com
   Amanda.Ireland@wilsonelser.com
7  Attorneys for Defendant,
   ROYAL ADMINISTRATION SERVICES, INC.

8

9              UNITED STATES DISTRICT COURT

10              DISTRICT OF NEVADA (RENO)

11  CHARLES A. JONES and JOSH           Civil Action No. 3:14-cv-00199-LRH-WGC
    WATSON, on behalf of themselves and all
12  similarly situated persons,

13              Plaintiffs,             **DEFENDANT ROYAL
                                        ADMINISTRATION, INC.'S MOTION
14       vs.                            FOR SUMMARY JUDGMENT**

15  ALL AMERICAN AUTO PROTECTION,       Case Filed:
    INC., ROYAL ADMINISTRATION          Judge:      Honorable Larry R. Hicks
16  SERVICES, INC., HAROUT
    PAMBUCKCHYAN, RAFFI SADEJYAN
17  and JASON GARCIA

18              Defendants.

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................ 2

II.     RELEVANT BACKGROUND ................................................................... 3

        A.      Factual Background .......................................................................... 3

                1.      The Parties........................................................................... 3

                2.      The Products......................................................................... 3

                3.      Agreements Between Royal and AAAP/Precise...................... 5

                4.      Vendor Relationship Between Royal and AAAP/Precise........ 7

                5.      The Calls to the Plaintiffs from AAAP.................................. 10

        B.      Procedural History ......................................................................... 10

III.    LEGAL STANDARD FOR SUMMARY JUDGMENT ............................. 11

IV.     CONCISE STATEMENT OF UNDISPUTED FACTS PURSUANT TO LR 56-1 ......... 12

V.      ARGUMENT ............................................................................................. 14

        A.      The Telephone Consumer Protection Act and Regulations Thereunder............ 14

        B.      Direct Liability............................................................................... 15

                1.      Direct Liability Under the TCPA Attaches Only to the Entity that Initiates
                        a Call .................................................................................. 15

                2.      Only in Rare Cases May Direct Liability for TCPA Violations be Imposed
                        Upon an Entity 'On Whose Behalf' a Third Party Places a Call............ 16

                                Analysis of Direct Liability............................................... 19

        C.      Vicarious Liability.......................................................................... 20

                        Royal is Not Vicariously Liable for the Calls Alleged by Plaintiffs under

                        Any Agency Relationship, whether Actual, Apparent or Ratified........... 21

                a.      Formal Agency Does Not Apply to the Alleged 'Diamond New
                        Car' Telemarketing Campaign............................................ 22

                b.      Apparent Agency Does Not Apply to the Alleged Unlawful
                        Campaign............................................................................ 24

                c.      Ratification Does Not Apply to These Facts........................... 26

        D.      "Sabotage" Liability ...................................................................... 27

IV.     CONCLUSION .......................................................................................... 29

1

1               **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

2     TO PLAINTIFFS AND THEIR COUNSEL:

3            PLEASE TAKE NOTICE that Defendant Royal Administration Services, Inc. ("Royal")

4 hereby moves the Court, pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7-2(e)

5 and 56-1, for summary judgment on all claims.

6            This Motion is based on this Notice of Motion and Motion, the Memorandum of Points

7 and Authorities below, the accompanying Affidavits of Richard McCabe and Meaghan Pomeroy,

8 the pleadings and papers on file in this action, any arguments of counsel at any hearings

9 scheduled by the Court in connection with this Motion, and any such further evidence and

10 material that the Court may allow.

11              **MEMORANDUM OF POINTS AND AUTHORITIES**

12 **I.**      **INTRODUCTION**

13            Plaintiffs have brought a proposed class action lawsuit alleging violations of the

14 Telephone Consumer Protection Act, 1991 ("TCPA"). (First Amended Complaint, Dkt. 58,

15 hereinafter, "FAC.") Initially, Plaintiff Charles Jones sought to recover from the corporate and

16 individual defendants who made the calls. (Original Complaint, Dkt. 1.) Now, Plaintiffs Jones

17 and Josh Watson (collectively referred to as "Plaintiffs") seek to extend liability to Royal,

18 alleging unlawful calls were made on its behalf, thereby imposing vicariously liability upon

19 Royal. (FAC at ¶35.) Plaintiffs complain that the solicitation phone calls made by employees of

20 All American Auto Protection offered a "Diamond New Car" protection plan. (FAC at ¶¶ 8, 18.)

21 Because Royal has never provided a "diamond new car" service contract through any of its direct

22 marketing vendors, the phone calls in question could not have been made on behalf of Royal nor

23 even by any telemarketer in actual or apparent capacity as Royal's agent. (*See* Exhibit 1,

24 Affidavit of Richard McCabe, ¶ 1 (hereinafter, "McCabe Affidavit").) For these reasons, Royal

25 moves this Court for Summary Judgment on each cause of action within Plaintiffs' Complaint.

26

27

28    *///*

                        2

## II.     RELEVANT BACKGROUND

### A.     *Factual Background*

#### 1.     *The Parties*

Royal Administrative Services, Inc. is a Florida corporation with its principal place of business in Hanover, Massachusetts. (Exhibit 1, McCabe Affidavit, ¶ 1.)  Royal is a provider and administrator of vehicle service contracts.  (Exhibit 1, McCabe Affidavit, ¶ 2; *see also* Exhibit 2, Deposition of Richard McCabe, March 2, 2015, 5:12 hereinafter, "McCabe Depo.") Royal's service contracts provide coverage such as automobile power train, stated component, or exclusionary coverage.  (Exhibits 1 & 2, McCabe Affidavit, ¶ 2; McCabe Depo. 5:16.)  Royal does not employ a sales staff, nor does it directly solicit service contract sales. Rather, Royal supplies its products to independent and franchise vehicle dealers, and to direct-to-consumer marketing companies. (Exhibits 1 & 2, McCabe Affidavit, ¶ 4; McCabe Depo. 7:24.)  Royal works with over 1000 different vendors, the majority of whom are vehicle dealers, and with about 20 direct marketing companies.  (Exhibits 1 & 2, McCabe Affidavit, ¶ 10; McCabe Depo. 9:20-22, 10:5-13).  At Royal's Hanover office, about 40 employees oversee customer service, contract services and claims adjudication for a range of vehicle service products.  (Exhibits 1 & 2, McCabe Affidavit, ¶ 4; McCabe Depo. 4:17).

During the periods relevant to the instant litigation, Royal was doing business with direct marketing vendors All American Auto Protection, Inc. ("AAAP") and Precise Enterprises, LLC. ("Precise").  (Exhibit 3, Affidavit of Meaghan Pomeroy, ¶ 3, (hereinafter, "Pomeroy Affidavit").)  AAAP is a Nevada corporation with a principal place of business at its call center in Azusa, California. (*Id.*)  Precise is a California LLC with a principal place of business located in Azusa, CA.  (*Id.*)  Precise changed its name to AAAP during the relevant period.  (*Id.*)  Precise/AAAP principals include Harry Pambuckchyan, Raffi Sadejyan, and Jason Garcia.  (FAC at ¶¶ 2, 3, 9.)

#### 2.     *The Products*

Royal is the provider and administrator of a range of vehicle service contract "products." Royal's products include:  Royal Shield (primary, preferred, premium and ultimate protection), Sentinel (3, 4 and 5 year plans), Select (3, 4 and 5 year plans), IAP (Integrity Auto Protection,

3

1  with essential, comprehensive, elite, and OEM coverage), PVP (People's Vehicle Protection, with

2  engine, power train, power train plus, classic, premier and global/apex levels of coverage),

3  Service Shield (basic, platinum, diamond and manufacturer's plus), and ancillary programs such

4  as gap protection, dent repair, tire and wheel hazards. (Exhibit 1, McCabe Affidavit, ¶ 3; *see also*

5  Exhibit 4, Royal website capture, ROYAL 000747-000846.)

6       Consumers purchase these so-called extended or aftermarket "warranties" or protection

7  plans from the manufacturer of their vehicle through their vehicle dealer, or through a third party

8  company when their manufacturer warranty expires. (Exhibit 1, McCabe Affidavit, ¶ 2.)  Some

9  of Royal's plans are supplied to dealers to offer direct to car buyers, other plans are supplied to

10  marketing vendors who offer and sell vehicle service contracts to consumers through direct mail

11  or telemarketing. (Exhibit 1, McCabe Affidavit, ¶ 2.)  Royal currently has agreements with about

12  1000 different vendors, either vehicle dealers or direct marketing vendors, to sell its vehicle

13  service contracts.  (Exhibit 1 & 2, McCabe Affidavit ¶ 5; McCabe Depo. 9:20-22.)   Direct

14  marketing vendors sell about 60 percent of Royal's vehicle service contracts, and independent

15  and franchise dealers sell about 40 percent, however, Royal uses only about 20 direct marketing

16  vendors at any given time. (Exhibit 1 & 2, McCabe Affidavit ¶ 5; McCabe Depo. 10:5-13.)

17       As a direct marketing vendor, Precise/AAAP sold four products for Royal during the

18  parties' course of dealing. (Exhibit 1, McCabe Affidavit, ¶ 11; *see also* Exhibit 5, List of all

19  Service Contracts sold by AAAP/Precise from October 28, 2011 to October 13, 2014, ROYAL

20  000059-000184 (hereinafter, "Royal Contracts Sold by AAAP").) Initially Precise sold Royal's

21  IAP and PVP vehicle service contracts. (Exhibit 1, McCabe Affidavit, ¶ 11; *see also* Exhibit 6,

22  March 2012 Commission Program Letter, ROYAL 000710, (hereinafter, "Commission Letter").)

23  During 2014, Precise/AAAP transitioned to selling Royal's Sentinel and Royal Shield service

24  contracts. (Exhibit 1, McCabe Affidavit, ¶ 11; *see also* Exhibit 7, Training Materials, ROYAL

25  000711-000746.)

26       Royal has never provided a "Diamond New Car" protection plan for any direct marketing

27  vendor to sell to consumers. (Exhibits 1 & 3, McCabe Affidavit, ¶¶ 12, 13; Pomeroy Affidavit,

28  ¶¶ 10, 11.)  Although Defendant AAAP sold over four thousand Royal Shield, Sentinel, IAP and

4

1   PVP protection plans, there was never a commission program, nor a single payment between

2   AAAP and Royal for any purported "Diamond New Car" service contract.  (Exhibit 1, McCabe

3   Affidavit ¶ 12; *see also* Exhibit 5, Royal Contracts Sold by AAAP.)

4       Royal acknowledges that its "dealer only" Service Shield program does contain a level of

5   service which includes the word "diamond." (Exhibit 4, Royal website capture, ROYAL 000791.)

6   It should be noted, however, that Royal's competitors also offer "diamond level" coverage within

7   certain vehicle service contracts.  (Exhibit 1, McCabe Affidavit ¶ 15.)  For instance, Interstate

8   National Dealer Services offers diamond coverage within its "Star Auto" group of warranties.

9   (Exhibit 8, Interstate website screenshots, ROYAL 000847-000852).  Similarly, American Auto

10  Shield offers an American Auto Shield Diamond Plan and an Interstate Diamond Plan.  (Exhibit

11  9, American Auto Shield website screenshots, ROYAL 000853-000858.)   Indeed, Royal

12  competitors Interstate and EFG both sold vehicle service contracts through the AAAP call center

13  during the relevant period.  (Exhibit 2, McCabe Depo. 118:15-25; Exhibit 10, Deposition of

14  Clayton Churchill, May 8 2015, 25:1-2.)  However, no telemarketing calls could have been made

15  by AAAP for the Service Shield program because Royal only provides its Service Shield program

16  to franchise and independent vehicle dealers.  (Exhibits 1 & 3, McCabe Affidavit ¶ 14; Pomeroy

17  Affidavit ¶ 11.)  AAAP was never authorized to sell any Service Shield vehicle service contracts.

18  (Exhibit 3, Pomeroy Affidavit ¶ 11.)  Additionally, no commissions were ever paid to AAAP for

19  a Service Shield vehicle service contract, for any level of service coverage.  (Exhibit 3, Pomeroy

20  Affidavit ¶ 11, *see also* Exhibit 5, Royal Contracts Sold by AAAP.)

21      *3.*      *Agreements Between Royal and AAAP/Precise*

22      Royal entered into a vendor agreement and non-disclosure and confidentiality agreement

23  with Precise Enterprises, LLC, on October 14, 2011.  (Exhibit 11, October 2011 Agreements,

24  ROYAL 000004-000014, *see also* Exhibit 3, Pomeroy Affidavit ¶ 4.)  Later, Royal entered into

25  an affiliated party fee agreement with Precise Enterprises on November 5, 2012.  (Exhibit 12,

26  Affiliated Party, ROYAL 000026-000028.)  Additionally, Precise entered into various third party

27  guaranty and reinsurance agreements.  (Exhibit 13, Guaranty & Agreement to Reinsure, ROYAL

28  000859-000861.)   During 2014, Precise transitioned into All American Auto Protection, and

Royal began to use the names Precise and AAAP interchangeably to refer to this vendor, but the original vendor agreement remained in effect.  (Exhibit 3, Pomeroy Affidavit ¶ 4; Exhibit 14, Letter of Understanding, ROYAL 000862-863.)

Significantly, AAAP executed agreements which expressly constrained them to using the specific sales and marketing methodologies approved by Royal:

> …Vendor acknowledges that it is only authorized to utilize or employ sales and marketing methodologies approved by Administrator.  Expressly excluded from these methodologies is any act or omission that violates applicable state or Federal law, including by not limited to "robo-calling," or contacting any consumer who has expressly affirmed his or her desire not to be contacted or called.  To the extent that Vendor uses telephone equipment in the performance of its obligations herein, Vendor acknowledges that outbound telephone calls to any Consumer must be expressly authorized by such Consumer.

(*See* Exhibit 11, Vendor Agreement at ¶ 2.)

Approved sales and marketing methodologies were set forth by Royal in its published statement of direct marketer standards and guidelines.  (Exhibit 3, Pomeroy Affidavit, ¶ 5; Exhibit 15, Royal Direct Marketer Standards and Guidelines, ROYAL 000186-000191.)  Precise also executed an Agreement to Comply with Guidelines and Standards with the "obligor" of certain contracts, Protective Life Insurance Company, on October 17, 2011.   (Exhibit 16, Agreement to Comply with Guidelines and Standards, ROYAL 000193-000199.)  Some of the standards of conduct relevant to the instant litigation are excerpted in the following table:

| Royal Administration Services, Inc. Direct Marketer Standards and Guidelines | Protective Agreements & Guidelines for Vehicle Service Contract Direct Marketers |
|---|---|
| *Outbound Telemarketing, p.4* | *Pre- and Post- Call Considerations, p2* |
| When telemarketing, Vendors shall *immediately disclose:*  The identity of the seller providing the goods or services for sale; That the purpose of the call is to sell goods or services; The nature of the goods or services being offered. | 3.  General federal and, if applicable, state telemarketing law requirements must be followed. Although these guidelines may reflect some of those legal requirements, they do not constitute a substitute for what the law requires.  Protective expects the direct marketer to be familiar with federal and state telemarketing laws and to abide by them when marketing a Protective VSC. |
| Vendors shall follow all state **and federal do not call laws and regulations** and register as a telemarketer in states where required….. | |

6

| Royal Administration Services, Inc. Direct Marketer Standards and Guidelines | Protective Agreements & Guidelines for Vehicle Service Contract Direct Marketers |
|---|---|
| Vendors shall not knowingly make *telephone solicitations to a wireless device* unless they have express permission from a person to call the wireless device for that purpose.  Vendors shall scrub their calling lists against a wireless number list unless the calling list only includes wireless numbers where the consumer has given their express consent to receive sales calls. | *Considerations for All Portions of the Call, p2* 1.   The direct marketer must disclose basic information about the nature of the call. Telemarketing laws generally require the disclosure of the following information:  (i) the name of the individual caller; (ii) the identity of the seller; (iii) that the purpose of the call is to sell products; and (iv) the nature of the products. |
| *Telemarketing using a Predictive Dialer or Third Party Vendor, p.5* | |
| No telephone call may be initiated using an autodialer:→ to any paging service, cellular telephone or an other service for which the called party is charged for the call; | |
| Teleblock service with insurance must be in place for all calls made to insure that no calls are made to telephone numbers on the national Do-Not-Call list or to wireless phones. | |

Excerpts from the approved sales and marketing methodologies set forth in Exhibit 15, Royal Direct Marketer Standards and Guidelines; Exhibit 16 Protective Life Insurance Company Agreement to Comply with Guidelines and Standards.

### 4.   *Vendor Relationship between Royal and AAAP/Precise*

Royal President Richard McCabe visited the Precise/AAAP call center in Azusa, California with the call center's agent of record Clayton Churchill about a dozen times between October 2011 and October 2014.  (Exhibit 1 & 2, McCabe Affidavit ¶ 7; McCabe Depo. 30:16-25.)  During these visits, McCabe discussed sales with Precise/AAAP principals Raffi Sadejyan, Harry Pambuckchyan and Jason Garcia, and also observed the telemarketing operation and saw people dialing customers one at a time.  (Exhibit 1, McCabe Affidavit at ¶ 9.)  Royal's General Counsel Meaghan Pomeroy (and her predecessor Paul Sporn) also had responsibilities to ensure due diligence and compliance for all vendors.  (Exhibits 2 & 3, McCabe Depo. 13:11-20, 108:1-4; Pomeroy Affidavit, ¶ 7; Exhibit 17, Deposition of Joanne Wisnaskas, March 11, 2015, hereinafter, "Wisnaksas Depo.", 71:13-20.)

810887v.2

Generally, Royal provides detailed specifications for the products each vendor may sell, including rate structure and price points, through a fulfillment company, Moxy. (Exhibits 1, 2, 17, McCabe Affidavit at ¶ 7; McCabe Deposition 57:6-16; Wisnaskas Depo. 29:18-21.) In turn, a vendor has a separate agreement with a third party lender to provide financing for vehicle service contracts - Precise used Omnisure for financing. (Exhibit 2, McCabe Depo. 17:13-22.) Omnisure imposed additional compliance requirements on AAAP, including recording all calls. (Exhibit 2 & 10, McCabe Depo. 71:4-12; Churchill Depo. 13:14-24.)

As its agent of record, Clayton Churchill provided on-site training to call center personnel regarding Royal products, customer service, claim structure, coverage and pricing. (Exhibits 10, 17, 18, Churchill Depo. 6:11-13, 24:5-9; Wisnaskas Depo. at 28:12-18: Deposition of Meaghan Pomeroy, March 11, 2015, hereinafter, "Pomeroy Depo." 53:22-25, 54:1-10.) The Commission Letter (Exhibit 6) and Churchill's training materials (Exhibit 7) confirm that Precise began selling only IAP and PVP service contracts, and later transitioned to selling Royal Shield and Sentinel contracts. Before working as Royal's call center agent, Churchill sold Royal vehicle warranties direct to dealerships. (Exhibits 10, 18, 20, Churchill Depo. 6:17-22, 8:4-9; Pomeroy Affidavit ¶ 5; Churchill Distribution Agreement with Buyer's Choice ROYAL 000864-000873.) Based on his long-standing association with Royal and Buyer's Choice, Churchill had knowledge and experience with Royal's entire product range. (Exhibits 3 & 10, Pomeroy Affidavit at ¶ 5; Churchill Depo. 7:8-12.) Additionally, the telemarketers at AAAP were well versed in the range of vehicle service contracts available from the different providers in the industry, including Royal, EFG and Interstate. (Exhibit 10, Churchill Depo. 46:10-11, 47:20-23.) To this point, Churchill has testified as follows:

A.   They never made a call on behalf of Royal. They were making a call trying to get a deal. And the screen would populate with EFG, Interstate and Royal and whoever else they had, and they would make a choice based on the screen, usually on price.

Q    When they made a telemarketing call, it was made ostensibly for a number of different vendors –

A.   To sell the concept of the importance of the consumer having a vehicle service contract.

1   Q.   So the telemarketing calls were made on behalf of a number of
2        vendors, including Royal. And then during the conversation, the
         conversation would be directed to one vendor or the other from the
3        list of a number of vendors, correct?

4   A.   Correct. Based on the right benefits for the right make and model,
         the right mileage, the price. It would usually be price, who is the
5        cheapest, whose markup is bigger.

6   (Exhibit 10, Churchill Depo. 47:3-23.)

7       In addition to training, Churchill performed a compliance function. "My commitment to

8   Royal and to Omnisure was to be their eyes and to go in and observe that they were complying

9   and not breaking the law..."  (Exhibit 10, Churchill Depo. 14:14-16, 18-24.)   Churchill also

10  investigated specific complaints that Royal received from customers, by pulling recordings of

11  such calls by last name, phone number or the last six digits of the customer's VIN number.

12  (Exhibit 10, Churchill Depo. 33:15-25 – 34:1-7, 36:16-18.)   Any call could be pulled from the

13  30,000 calls made each month.  (Exhibit 10, Churchill Depo. 35:12-24.)  Pomeroy's compliance

14  function included general due diligence and periodic requests of Do Not Call compliance.

15  (Exhibit 18, Pomeroy Depo. 9:12-17, 15:19-22.)

16      Upon receiving notice of a possible Do Not Call violation from Omnisure in June 2014,

17  Royal requested from AAAP the numbers they had dialed, proof of their subscription to the DNC

18  list, proof of scrubbing against the list, and copies of the calls.  (Exhibits 17 & 18, Wisnaskas

19  Depo. 34:15-23; 35:21-36:8; Pomeroy Depo. 18:4-14.)   Royal received proof of the DNC

20  subscription, verification 206,335 phone records had been scrubbed, and a list of calls.  (Exhibit

21  18, Pomeroy Depo 18:16-23, 22:13-16; 25:22-24; Exhibit 19, DNC Scrubbing Receipt.)  Royal

22  also received a set of call recordings from AAAP.  (Exhibit 18, Pomeroy Depo. 72:14-25.)

23  Further, though the source of leads is a guarded secret in the industry, Royal received assurances

24  from AAAP principals Sadejyan and Pambuckchyan that all phone numbers AAAP received were

25  certified as "scrubbed" from the Do Not Call list by the lead generators.  (Exhibit 2, McCabe

26  Depo. 50:1-25-51:1-7.)   Scrubbing is a computer program that electronically "cleanses" a

27  telemarketer call list to remove any telephone numbers that should not be called.  (Exhibit 1,

28  McCabe Affidavit at ¶ 9.)  The scrubbing process compares a call list to the most recent national

9

1   and state Do-Not-Call registries to produce a clean call list for telemarketers to use.  Each

2   scrubbing list is valid for up to 31 days after scrubbing.  (Exhibit 1, McCabe Affidavit at ¶ 9.)

3          Royal temporarily suspended Precise/AAAP telemarketing operations during its

4   compliance investigations.  Sporn authorized a temporary suspension of Precise operations for

5   product knowledge issues during early 2012.  (Exhibit 10, Churchill Depo. 12:18-24; 21:3-19;

6   22:1-8.)  Pomeroy also supervised an investigation and suspension into a possible DNC violation

7   in June 2014.  (Exhibit 3, Pomeroy Affidavit, ¶ 7.)  On each occasion, Churchill performed an on-

8   site investigation of the suspected wrongdoing or violations.  (Exhibit 9, Churchill Dep. 12:18-24;

9   21:3-19; 22:1-8.)   Royal found no evidence of telemarketing violations during these

10  investigations.  (Exhibit 3 & 10, Pomeroy Affidavit, ¶ 7; Churchill Depo. 22:1-8; 27:16-29:22.)

11          *5.     The Calls to the Plaintiffs from AAAP*

12         Plaintiffs have each alleged they received four calls on various dates in March, April and

13  May 2014.  (FAC at ¶¶ 2, 3, 9.)  Both Plaintiffs allege that the calls were made with the use of an

14  automated dialing machine, because each Plaintiff heard "clicking noises" as they answered the

15  call.  (FAC at ¶¶ 8, 18.)  Significantly, Plaintiffs alleged the calls were from AAAP.  (FAC at ¶

16  8:10-14: "Mr. Morris confirmed that he was calling from All American Auto Protection, based in

17  Las Vegas"; the 800 phone number provided to Plaintiff corresponded with the contact number

18  on AAAP's website: www.aaaprotection.com.)   Most importantly, Jones and Watson further

19  allege that during each of the calls in question, they were offered a "Diamond New Car"

20  protection plan for purchase.  (FAC at ¶¶ 8, 18.)  No further facts were alleged as to who was the

21  provider or underwriter of such a plan, and none of the callers mentioned Royal.

22      **B.     *Procedural History***

23         Plaintiff, Charles A. Jones, himself a plaintiff's class action lawyer, (hereinafter "Jones")

24  initiated this lawsuit in April 2014 against corporate Defendant AAAP (aka Precise), and

25  individual Defendants Harout Pambuckchyan, Raffi Sadejyan, and Jason Garcia (hereinafter

26  collectively, "*Primary Defendants*") for allegedly making phone calls to Mr. Jones purportedly in

27  violation of the TCPA.

28

810887v.2

1    On January 8, 2015, AAAP's Answer was stricken and default entered against AAAP for

2 failure to "otherwise defend" this action. (Dkt. 58.) Subsequently, the court also entered default

3 against all three individual defendants. (Dkt. 75, 76, and 82.) Meanwhile, following discovery

4 identifying agreements between AAAP and Royal, Jones added Josh A. Watson as an individual

5 Plaintiff, and named Royal as a defendant. A First Amended Class Action Complaint including

6 these new parties was filed on January 14, 2015. (Dkt. 58.) With the primary defendants

7 defaulted out of the litigation, Plaintiffs now pursue the "deeper pockets" of Royal, seeking to

8 impose liability on the basis of unlawful calls which were purportedly made on Royal's behalf.

9 (FAC at ¶ 35).

10    Since the filing of this action, Royal has produced 873 pages of documents to Plaintiffs'

11 counsel, and has made available three of its senior executives as witnesses for deposition:

12 President Rich McCabe, Chief Operating Officer Joanne Wisnaskas, and General Counsel

13 Meaghan Pomeroy. Plaintiffs have also deposed Royal's agent of record for the AAAP call

14 center, Clayton Churchill. Despite volumes of testimony and documents already elicited and

15 obtained by Plaintiffs, one indisputable fact remains: **Royal has never provided a Diamond**

16 **New Car protection plan for any direct marketing vendor to sell to customers.** Because the

17 primary defendants were not offering a Royal product in the alleged unlawful phone calls, and

18 since Royal never authorized or ratified the marketing of any "diamond new car" warranty on its

19 behalf by Precise/AAAP, Royal cannot be held directly or vicariously liable as a matter of law.

20 **III.    LEGAL STANDARD FOR SUMMARY JUDGMENT**

21    The purpose of summary judgment is to avoid unnecessary trials when there is no dispute

22 as to the facts before the court. *JL Beverage Co., LLC v. Beam, Inc.*, No. 2:11-cv-00417, 2013

23 U.S. Dist. LEXIS 35370, *10-11 (D. Nev. Mar. 14, 2013) *Nw. Motorcycle Ass'n v. U.S. Dep't of*

24 *Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Therefore, summary judgment should be granted

25 when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there

26 is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter

27 of law." Fed. R. Civ. P. 56; *JL Beverage Co.*, 2013 U.S. Dist. LEXIS 35370 at *10-11; *Celotex*

28 *Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A material issue of fact is one that affects the

11

1   outcome of the litigation and requires a trial to resolve the differing versions of the truth. *Bush v.*

2   *Nationstar Mortgage, LLC*, No. 3:08-cv-00680, 2010 U.S. Dist. LEXIS 84975, *3-4 (D. Nev.

3   Aug. 17, 2010).

4   On summary judgment, the moving party bears the initial burden of demonstrating the

5   absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law.

6   Fed. R. Civ. P. 56; *Celotex*, 477 U.S. at 323. If that burden has been met, the non-moving party

7   must then come forward and establish the specific material facts in dispute to survive summary

8   judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). The

9   non-moving party's burden is such that it must do more than simply show there is some

10   metaphysical doubt as to the material facts. *Matasushita Elec. Indus. Co. v. Zenith Radio Corp.,*

11   475 U.S. 574, 586, 106 S. Ct. 1348 (1986). Accordingly, mere disagreement or bald assertions

12   that a genuine issue of material fact exists does not preclude the use of summary judgment.

13   *Harper v. Wallingford*, 877 F. 2d 728, 731 (9th Cir. 1989). In other words, "conclusory

14   allegations that are unsupported by factual data cannot defeat a motion for summary judgment."

15   *Bush*, 2010 U.S. Dist. LEXIS 84975 at *3-4.

16   **IV.     CONCISE STATEMENT OF UNDISPUTED FACTS PURSUANT TO LR 56-1**

17   Pursuant to Local Rule 56-1, Royal sets forth the following facts that are material to the

18   disposition of this Motion for Summary Judgment and that are not in dispute for purposes of this

19   Motion (even if all allegations of Plaintiffs are accepted as true):

| Undisputed Material Fact | Supporting Evidence |
| --- | --- |
| Plaintiffs, Mr. Jones and Mr. Watson, received eight phone calls from All American Auto Protection in 2014. | Plaintiffs allege they received calls on cellular/residential telephone numbers from a phone number they attribute to All American Auto Protection. (FAC, 4 at ¶ 8:20, 25-26.) |
| The phone calls were made using an automatic dialing machine. | Plaintiffs allege there was a long pause (seven seconds) and clicking noises after they answered each call. (FAC, 5 at ¶ 8:3-4; 7 at ¶ 18:12-13, 22-23.) |
| None of the Defendants had permission to call either Plaintiff, therefore Plaintiffs did not provide "express consent" for any | Plaintiffs state that neither gave express consent to any of the Defendants. (FAC, 8 at ¶ 20:1-2; 4 at ¶ 8:27-9:1.) |

12

| Undisputed Material Fact | Supporting Evidence |
|---|---|
| of the Defendants to call their cellular lines. | |
| The calls offered a "Diamond New Car" protection plan to Plaintiffs. | Plaintiffs allege the violative calls offered a Diamond New Car protection plan.  (FAC, 5 at ¶ 8:6-7; 7 at ¶ 18:15.) |
| Royal had commission agreements with AAAP to direct market four (4) service contract products: IAP,  PVP, Royal Shield and Sentinel, and Royal paid commissions to AAAP for sales of those four service products <u>only</u>. | Exhibit 5, Royal Contracts Sold by AAAP from October 28, 2011 to October 13, 2014; Exhibit 6, Commission Letter.  (*See also* McCabe Affidavit at ¶¶ 11-12; Pomeroy Affidavit at ¶ 9-10.) |
| Defendant Royal has never had any agreements with AAAP/Precise or any other direct marketing vendors to sell a "Diamond New Car" protection plan. | McCabe Affidavit at ¶ 13. Pomeroy Affidavit at ¶ 11. *See also* Exhibit 5, Royal Contracts Sold by AAAP; Exhibit 6 Commission Letter. |
| Royal's competitors Interstate and American Auto Shield also offer "diamond plans" vehicle service contracts. | Interstate and American Auto Shield marketing collateral publicly available on the internet. *See, e.g.,* Exhibit 8, Interstate website screenshots; Exhibit 9, American Auto Shield screenshots. |
| Plaintiffs cannot prove AAAP was ever contracted to market a "Diamond New Car" protection plan on Royal's behalf. | No documentation, deposition testimony or other evidence exists. |
| Royal VSC lender Omnisure expressly prohibited Precise/AAAP from making calls in violation of the Do Not Call Registry and without prior express consent of the person being called. | Exhibit 11, Agreements at ¶ 2 (banning calls by AAAP in violation of DNC or without express consent). Exhibits 15 & 16, Standards & Guidelines (banning calls by AAAP in violation of DNC or to wireless devices without express consent). |
| Royal undertook multiple, good faith efforts to monitor compliance of Precise/AAAP. | Affidavit and Deposition Testimony of Richard McCabe, Meaghan Pomeroy, Joanne Wisnaskas, and Clayton Churchill. |

Even accepting all of Plaintiffs' allegations as true in favor of the non-moving party, the facts set forth hereinabove constitute undisputed material facts and supporting evidence sufficient for this Court to grant Royal's Motion for Summary Judgment.

13

1    V.    **ARGUMENT**

2        Law interpreting the Telephone Consumer Protection Act of 1991 is in a state of flux

3    following a nationwide surge in lawsuits against telemarketers such as the instant case.[1]

4    Nonetheless, even under multiple and various recent interpretations of TCPA liability, there exists

5    no genuine issue as to any material fact supporting the allegations that Royal is directly or

6    vicariously liable under the TCPA for the calls that AAAP made to the Plaintiffs offering a

7    "diamond new car" protection plan.

8        *A.*    ***The Telephone Consumer Protection Act and Regulations Thereunder***

9        The TCPA makes it unlawful for a person to call the cellular telephone number of any

10   other person using an automatic telephone dialing system without the recipient's prior express

11   consent.   47 U.S.C. § 227(b)(1)(A)(iii).   An automatic telephone dialing system (ATDS) is

12   defined as "equipment which has the capacity to store or produce telephone numbers to be called,

13   using a random or sequential number generator and to dial such numbers.  Id. at § 227(a)(1).

14   Additionally, an action may be brought by a person who has received more than one telephone call

15   within any 12-month period by or on behalf of the same entity in violation of the regulations

16   prescribed under this subsection. 47 U.S.C. § 227(c)(5).

17       Regulations applicable to any entity or person making telemarketing calls to wireless

18   numbers are set forth in 47 C.F.R. § 64.1200. Plaintiff's complaint references 47 C.F.R. §

19   64.1200(c), (d) and (e).  Section 64.1200(c) provides that "[n]o person or entity shall initiate any

20   telephone solicitation to:  (2) A residential telephone subscriber who does not wish to receive

21   telephone solicitations that is maintained by the Federal Government…. § 64.1200(d) further

22   provides: "[n]o person or entity shall initiate any call for telemarketing purposes to a residential

23   telephone subscriber unless such person or entity has instituted procedures for maintaining a list

24   of persons who request not to receive telemarketing calls made by or on behalf of that person or

25   entity."  § 64.1200(d) enumerates minimum procedures:  (1) written policy; (2) training of

26   personnel engaged in telemarketing; (3) recording, disclosure of do-not-call requests; (4)

27

28   [1] TCPA Litigation Developments: Inconsistent federal court decisions headline a hectic year, John R. Chiles, Zachary D. Miller, 70 Bus. Law 573 Spring, 2015, 1 (2015).

1    identification of sellers and telemarketers; (5) affiliated persons or entities; and (6) maintenance

2    of do-not-call lists.

3          Here, Plaintiffs seek damages pursuant to 47 U.S.C. § 227(b)(3) and (c)(5) for alleged

4    violations of § 227(b)(1)(A)(iii) and failures to implement procedures set forth in 47 C.F.R. §

5    64.1200(d) and (e).  The violations alleged against Royal attempt, but fail to implicate either

6    direct or vicarious liability under the TCPA.

7          **B.**    **_Direct Liability_**

8          Federal courts are in almost universal agreement that <u>direct</u> liability under the TCPA only

9    attaches to the entity that physically places a call.  *See, e.g., Smith v. State Farm Mutual*

10   *Automobile Ins*. Co., 30 F. Supp.3d 765, 771 (N.D. Ill. 2014)(citing *In the Matter of the Joint*

11   *Petition Filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6574 (May 9, 2013)).  A person or

12   entity "initiates" a telephone call, as required to be subject to direct liability under the TCPA

13   when it takes the necessary steps to physically place a telephone call.  *In re Dish Network,* 28

14   F.C.C.R. at 6583 ¶ 26, and at 6593 ¶ 48; *Golan v. Veritas Entm't, LLC*, 2015 U.S. App. LEXIS

15   9489, at *12 (8th Cir. June 8, 2015) (a seller is not directly liable for a TCPA violation unless it

16   initiates the call).  The prospect of <u>direct</u> liability attaching to a seller <u>upon whose behalf</u> unlawful

17   calls are made is an exception to the general rule in collections or fax cases, or theoretical liability

18   hypothesized by a few courts.  *See, e.g. Ossola v. Am. Express Co.*, 2015 U.S. Dist. LEXIS

19   63052, *4-6 (N.D. Ill. Feb. 20, 2015).  However, under these facts, direct liability cannot attach to

20   Royal under the majority or minority/theoretical position.

21          1.    _Direct Liability Under TCPA Attaches Only to the Entity that Initiates a_

22                _Call_

23          In its landmark May 2013 ruling on direct liability *In re Dish Network*, the FCC made

24   clear that direct liability under the TCPA applies only to entities that initiate the phone calls:

25          Our rules have long drawn a distinction between the telemarketer who initiates a
26          call and the seller on whose behalf a call is made. In accordance with those rules,
             as we explain below, we clarify that a seller is not directly liable for a violation of
27          the TCPA unless it initiates a call, but may be held vicariously liable under federal
             common law agency principles for a TCPA violation by a third-party telemarketer.

28

1   *In re Dish Network*, 28 F.C.C.R. Rcd. at 6582, ¶ 24.

2        Here, Royal never placed the calls which form the basis of Plaintiffs' complaint.

3   (Complaint at ¶ 8:10-14: "Mr. Morris confirmed that he was calling from All American Auto

4   Protection, based in Las Vegas"; the 800 phone number provided to Plaintiff corresponded with

5   the contact number on AAAP's website: www.aaaprotection.com.)  Nowhere does the Complaint

6   allege that Royal physically made the calls.  Accordingly, under the majority position in *Dish*

7   *Network* and *Smith*, **Royal cannot be directly liable for any TCPA violations committed by**

8   **AAAP as a matter of law, because Royal did not initiate any of these telephone calls.**

9        Recently, some courts have held that direct liability <u>can</u> be imposed upon any entity "on

10  whose behalf" a third party places a call in violation of the TCPA.  To the extent Plaintiffs have

11  even alleged that AAAP placed calls on Royal's behalf, (E.g. vaguely placed "on behalf"

12  language in the Amended Complaint at ¶¶ 3:7, 38(4)), and in the interests of providing a thorough

13  analysis of all applicable law in the unsettled realm of telemarketing law, this alternate authority

14  and analysis is also presented.

15            2.    *Only in Rare Cases, May Direct Liability for TCPA Violations be Imposed*

16                  *Upon an Entity "On Whose Behalf" a Third Party Places a Call.*

17        Several recent decisions have explored the possible exceptions to the general rule set forth

18  in *Dish Network*, that "a seller generally does not initiate calls placed by third-party

19  telemarketers." *See, e.g., Ossola v. Am. Express Co.*, 2015 U.S. Dist. LEXIS 63052, *4-6 (noting

20  that a seller may be "so involved in the placing of a specific telephone call as to be directly liable

21  for initiating it – by giving the third party specific and comprehensive instructions as to the timing

22  and the manner of the call, for example" citing FCC Ruling, 28 FCCR at 6583 ¶ 27.)  *See also,*

23  *Smith v. State Farm Mutual Automobile Ins*. Co., 30 F. Supp.3d at 771.  In a mortgage collections

24  case, a Pennsylvania district held that "the TCPA can impose liability directly or vicariously upon

25  any person or entity on whose behalf a third party places a call in violation of § 227(b)(1)(A)."

26  *Hartley-Culp v. Green Tree Servicing, LLC*, 52 F. Supp.3d 700, 703 (M.D. Pa. Oct. 10 2014)

27  (concluding that calls placed by a third party collector on behalf of a creditor are treated as if the

28  creditor itself placed the call).

810887v.2

A Florida magistrate reviewed the evolving contours of TCPA liability in the facsimile marketing setting when he evaluated the effect of an 11th Circuit decision asserting that vicarious liability through common law agency is not required for an entity to be held directly liable under the TCPA. *Cin-Q Automobiles, Inc., v Buccaneers Ltd. Partnership*, 2014 WL 7224943 *7, 2014 U.S. Dist. LEXIS 174134 *19 (M.D. Fla. Dec. 17, 2014) (*reconsideration denied* May 5, 2015) (citing *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 771 F.3d 1274 (11th Cir. 2014)[2]; *accord*, *Bais Yaakov v. Varitronics, LLC*, 2015 U.S. Dist. LEXIS 44016, *10 (D. Minn. Apr. 3, 2015).

> [T]he *Sarris* opinion makes clear that vicarious liability through common law agency is not required for an entity to be held directly liable under the TCPA. By the same stroke, however, *Sarris* also appears to reject the application of per se, automatic liability….This Court is, therefore, left only to conclude that "on whose behalf" is a standard lying somewhere in the middle – more forgiving than a blanket application of per se liability but somewhat more stringent than vicarious liability through common law agency. It seems *Sarris* has, in essence, allowed for direct liability through a totality test based loosely on agency principles, aimed at establishing the origin of the offending behavior.

*Cin-Q Automobiles, Inc.,* 2014 WL 7224943 *7.

Meanwhile, the Ninth Circuit has held that an entity could be liable for TCPA violations under either direct liability or vicarious liability theories, but reached this conclusion in an unpublished decision devoid of any meaningful analysis of direct liability. *Thomas v. Taco Bell Corp.*, 582 Fed. Appx. 678 (9th Cir. July 2, 2014) (not for publication)[3]. The California central district recently examined the differing approaches to TCPA liability by the Ninth and Eleventh Circuits in *Sarris* and *Thomas,* and accorded little weight to *Thomas* because it was neither binding nor well-reasoned. *Lushe v. Verengo, Inc.*, 2015 WL 500158 *7, 2015 U.S. Dist. LEXIS 16961 *17 (C.D. Cal. Feb. 2, 2015).

Although *Hartley-Culp* and *Ossola* implicated creditor calls, analyzed under a different standard than marketing calls, *Smith* and *Cin-Q* are instructive for fact patterns not dissimilar to

---

[2] The 11th Circuit *sua sponte* vacated, reconsidered and substituted its 2014 opinion in *Sarris* in March 2015 with *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 781 F.3d 1245 (11th Cir. 2015). The new opinion provides additional analysis on other grounds, but leaves the analysis of direct and vicarious liability under the TCPA unchanged.

[3] Pursuant to USCS Fed. Rules. App Proc. R. 32.1, a court may not prohibit or restrict the citation of federal judicial opinions, orders, judgments or other written dispositions that have been: (i) designated as "unpublished," "not for publications…; and (ii) issued on or after January 1, 2007.

810887v.2

the instant case. In *Smith*, the Plaintiffs alleged the insurance companies marketed their services through the use of a lead generator marketing company, whose telemarketing calls violated the TCPA. 30 F. Supp.3d at 771. Although defendant insurance agents had some input on the timing and manner of calls and the marketing company transferred some calls to the insurance agents, the *Smith* plaintiffs were unable to attribute the actions of defendants' insurance agents to defendants themselves. *Id.* Further, two email quotes for homeowners insurance arising from the calls were attached to the complaint, but again, these originated from the agents not the insurance company. *Id.* The *Smith* court found none of this evidence to be a plausible basis for direct liability. *Id.* In *Hartley-Culp*, Fannie Mae's motion to dismiss was denied because a transcript of the voice message left by Fannie Mae's telemarketer stated the speaker was calling "on behalf of Fannie Mae" and that "help from Fannie Mae is available but you must return our call." *Hartley-Culp,* 52 F. Supp.3d 700, 704.

*Cin-Q* involved an unsolicited fax advertisement analysis under § 227(b)(1)(C), and provides a useful "on whose behalf" totality test. *Cin-Q,* 2014 WL 7224943 *6. In *Cin-Q,* Defendant Buccaneers LP contracted with fax marketer "FaxQom" to send waves of faxes advertising Buccaneers tickets to area codes around Tampa Bay. *Id.* at *1. *Cin-Q* proposed the following considerations to weigh in determining on whose behalf offending behavior is conducted: the degree of input and control over content; actual content; contractual or expressly stated limitations and scope of control between the parties; privity of the parties involved; approval of final drafts; method and structure of payment; overall awareness of the circumstances (access to and control over recipient lists); and the existence of measures taken to ensure compliance and/or cure non-compliance with the TCPA. *Id.* at *7. The *Cin-Q* factors hew closely to the guidelines set forth in 47 C.F.R. Sec. 64.1200 (*see supra, p13*).

In *Sarris*, the "on whose behalf" question went to a jury based on facts that "…Sarris gave his marketing manager free rein to market the practice…[the] marketing manager contracted with B2B to initiate a fax advertisement campaign on behalf of the dental practice. …[and] on December 13, 2005, after receiving payment of $420.00 from Defendant, B2B transmitted an unsolicited fax advertisement promoting Sarris, D.D.S.'s services to Palm Beach Golf." Despite

18

1  a clear connection between defendant, defendant's marketing manager, a third party broadcaster

2  and plaintiff, *Sarris* held that "a query exists as to the question of *on whose behalf* the fax

3  advertisement was sent." *Sarris*, at 771 F.3d at 1258.

4  **Analysis of Direct Liability**

5        Even under the broadest interpretation of "on whose behalf" direct liability, Plaintiffs

6  cannot show that the alleged calls in this matter, offering a "diamond new car protection plan"

7  were made *on behalf of* Royal.  As set forth more fully below, no one mentioned Royal in these

8  calls, Royal has no such plan, and voluminous documentation and testimony fails to show

9  Royal's control or direction of any content relating to a "diamond new car" service plan.

10  Moreover, evidence of contractual agreements, payments and compliance between Royal and

11  Precise fails to support an "on whose behalf" conclusion in relation to the alleged calls.

12        (1)    As stated earlier, unlike mention of Fannie Mae in *Hartley-Culp,* and the

13  Buccaneers in *Cin-Q*, here, each caller in this action mentioned <u>only</u> All American Auto

14  Protection, and <u>not</u> Royal.  (FAC at ¶ 8:10-14: "Mr. Morris confirmed that he was calling from

15  All American Auto Protection, based in Las Vegas"; the 800 phone number provided to Plaintiff

16  corresponded with the contact number on AAAP's website: www.aaaprotection.com.)

17        (2)    Here, no Royal product was offered in the calls to Plaintiffs unlike Defendant

18  Buccaneers' product, Buccaneers tickets, were included in the telemarketing content in *Cin-Q*.

19  (Exhibit 5, Royal Contracts Sold by AAAP, showing only Royal Shield, Sentinel, IAP and PVP

20  protection plans, none of which include any "diamond new car" protection. *See also* McCabe

21  Affidavit at ¶¶ 9-10.)  Moreover, Royal most certainly would not engage third-party marketers to

22  sell non-Royal products.  Indeed, Exhibit 5 is clear that no compensation was ever paid by Royal

23  to AAAP for service contracts other than Royal Shield, Sentinel, IAP and PVP.

24        (3)    Unlike the insurance quotes emailed to the Plaintiffs following the illegal calls in

25  *Smith*, here there was no follow-up quote from AAAP for a Royal Shield, Sentinel, IAP or PVP

26  service contract, nor any indication who serviced or underwrote the vaguely described "diamond

27  new car" plan.  Even if Plaintiffs try to claim AAAP was telemarketing the diamond service level

28  from Royal's dealer only *Service Shield* program, nothing in the record connects the dots between

19

1   Royal, AAAP, and Service Shield. It is just as likely that AAAP was marketing a "diamond plan"

2   from one of the "Star" group of warranties administered by Royal competitor Interstate or even

3   selling an American Auto Shield diamond plan. *See* Exhibit 8, 9. Further, the three major vehicle

4   service contract administrators, (Royal, Interstate and EFG) all sold products through the AAAP

5   call center. (McCabe Depo. 118:15-25; Churchill Depo. 46:10-11, 47:20-23.)

6         (4)   Royal's express prohibition of TCPA violations, and multiple, good faith

7   compliance efforts compare favorably with the *Cin-Q* factors, and the problematic "free rein"

8   given to the marketing manager in *Sarris*. Royal's vendor agreement with Precise/AAAP and

9   direct marketing guidelines and standards prohibited all calls in violation of the DNC registry, or

10  where prior express consent was not obtained. (Exhibit 11, 15, 16, Agreements ¶ 2, Royal &

11  Protective Marketing Standards and Guidelines.) Royal also undertook multiple forms of

12  compliance monitoring, including periodic site visits, an agent to supervise the account; and

13  immediate investigation of DNC compliance and temporary suspensions upon the rare notice of

14  possible DNC violations. (*See, e.g.,* <u>on-site visits by agent Churchill and President McCabe</u>:

15  Exhibit 1 & 10, McCabe Affidavit, ¶ 7; Churchill Depo. 14:14-16, 18-24, 33:15-25-34:1-7,

16  36:16-18; <u>assurances of "scrubbed" leads and DNC compliance and no robo-dialing by AAAP</u>

17  <u>principals</u>: Exhibits 2 & 10, McCabe Depo. 50:1-25-51:1-7; Churchill Depo. 12:18-24; 21:3-19;

18  22:1-8; <u>supervision of vendor compliance by general counsel</u>, (Exhibits 2, 3, 17) McCabe Depo.

19  13:11-20, 108:1-4; Pomeroy Affidavit, ¶ 5; Wisnaskas Depo., 71:13-20); <u>immediate</u>

20  <u>investigations, suspensions for possible TCPA violations</u>: Exhibit 3, Pomeroy Depo 18:16-23,

21  22:13-16; 25:22-24; Exhibit 20, DNC Scrubbing Receipt; <u>no evidence found by Royal of TCPA</u>

22  <u>violations</u>: Exhibits 3, 10, Pomeroy Affidavit, ¶ 7; Churchill Depo. 22:1-8; 27:16-29:22.)

23      *C.*    ***Vicarious Liability***

24        In interpreting the TCPA, the FCC has expressly rejected the notion that the TCPA creates

25  strict liability, instead concluding a "Principal" <u>may</u> be liable under the TCPA for the acts of a

26  third party if the party acted in accordance with a formal agency relationship, possessed "apparent

27  (if not actual) authority for its conduct, or if the principal ratified the third-party's acts by

28

810887v.2

1    knowingly accepting their benefits." *In re Joint Petition filed by Dish Network LCC*, 28 F.C.C.

2    6574, 6586-87 (2013).

3        In so concluding, the FCC found incorporation of general common law agency principles

4    of vicarious liability harmonious with the TCPA's statutory text and legislative purpose and,

5    accordingly read such baseline agency principles into its interpretation of the telemarketing

6    provisions of the TCPA. *Id* at 6587. (*See* FCC's 2006 Order (21 F.C.C. Rcd. 3787, 3822, App.

7    A at (f)(8)(2006), at 3808.) Since *Dish Network*, the vast majority of courts have agreed an entity

8    may be vicariously liable for violations of section 227(b) under a broad range of common-law

9    agency principles. *Smith v. State Farm Mutual Automobile Ins*. Co., 30 F. Supp.3d 765, 774

10   (N.D. Ill. 2014)(collecting cases).

11                    *Royal is Not Vicariously Liable for the Calls Alleged by Plaintiffs under*
12                    *Any Agency Relationship, whether Actual, Apparent or Ratified.*

13       Royal does not dispute that AAAP/Precise was a contracted agent of Royal for certain

14   service contracts, namely the Royal Shield, Sentinel, IAP and PVP protection plans.  Yet even

15   after extensive discovery, Plaintiffs can offer no evidence AAAP was authorized as Royal's agent

16   for a Diamond New Car protection plan, because Royal **does not even provide such a product.**

17       Moreover, any calls made to persons that do not provide express consent, or who are listed

18   on the "do not call list" violate the terms of agency imposed by Royal on any of its direct

19   marketing vendor, including AAAP as a telemarketer of Royal Shield, Sentinel, IAP and PVP

20   products.  Thus Plaintiffs are unable to succeed on a formal agency theory of vicarious liability.

21   Because Royal does not sell a "Diamond New Car" protection plan, neither Plaintiff can

22   reasonably believe that AAAP was acting on behalf of Royal with apparent authority.

23   Additionally, under these facts, it is clear that Royal never ratified any actions AAAP may have

24   taken to solicit sales for a Diamond New Car protection plan.  Therefore, Royal cannot be

25   vicariously liable for the calls alleged by Plaintiffs under any agency relationship, whether actual,

26   apparent or ratified.

27

28

810887v.2

1            **a.**       **Formal Agency Does Not Apply to the Alleged**

2                   **"Diamond New Car" Campaign**

3       Formal agency is a "fiduciary relationship that arises when one person (a 'principal')

4 manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf

5 and subject to the principal's control, and the agent manifests assent or otherwise consents so to

6 act." Restatement (Third) Agency § 1.01 (2006). *Smith*, 30 F. Supp.3d at 775 (noting the federal

7 common law of agency is in accord with the Restatement).

8       Vicarious liability under the TCPA is appropriate when the plaintiff can demonstrate that

9 a defendant "controlled or had the right to control [the entity that committed the TCPA violation],

10 and more specifically, the manner and means of the [telemarketing campaign] it conducted."

11 *Thomas v. Taco Bell Corp*., 582 Fed. Appx. 678, 679 (9th Cir.2014) (citing *Thomas v. Taco Bell*

12 *Corp*., 879 F.Supp.2d 1079, 1084 (C.D.Cal.2012) (citing *United States v. Bonds*, 608 F.3d 495,

13 506 (9th Cir.2010))).   The existence of a contract…even one that imposes certain

14 constraints…does not necessarily mean that a party has the power to give interim instructions, the

15 hallmark of an agency relationship. *See* Restatement (Third) of Agency § 1.01 cmt. f(1) "[T]he

16 power to give interim instructions distinguishes principals in agency relationships from those who

17 contract to receive services provided by persons who are not agents." *Smith*, 30 F. Supp. 3d at

18 775-776.

19       In *Thomas,* the Ninth Circuit affirmed the district court in finding insufficient evidence

20 that Taco Bell [Corp.] controlled the actions of a local association of Taco Bell owners and their

21 advertiser and telemarketer, with respect to the <u>campaign they conducted</u> (text messages

22 advertising a Taco Bell "Nacho Belle Grande product"). *Thomas*, 879 F.Supp.2d at 1084 (citing

23 *United States v. Bonds*, 608 F.3d 495, 506 (9th Cir.2010)). "…Thomas must demonstrate that

24 these entities… acted as …agent[s] of Taco Bell: that Taco Bell controlled or had the right to

25 control them, <u>and more specifically, the manner and means of the text message campaign they</u>

26 <u>conducted</u>." Most recently, the Northern District of California applied the *Taco Bell* test in

27 *Panacci v. A1 Solar Power, Inc.,* 2015 U.S. Dist. LEXIS 77294, *6-7 (N.D. Cal. June 15, 2015),

28 declining to impose TCPA liability vicariously on A1 Solar Power citing a lack of control over

1   the means of the calls placed by codefendant National Renewable Energy Center (NERC). *Id.* In

2   *Panacci*, the court examined the context of a telemarketing call and whether explicit mention of a

3   good, product or service was necessary to establish liability for a telephone solicitation. *Id.* at 2,

4   5-6.  Notably, vicarious liability claims were dismissed against A1, even though in some of the

5   calls to Plaintiff NERC mentioned A1. *Id.* at 7.

6          In contrast, in *Smith*, the court found formal agency plausible because State Farm

7   insurance agents who hired the telemarketer "directed the quality, timing, and volume of

8   Variable's telemarketing calls and …. provided information to Variable regarding the nature and

9   pricing of State Farm's products to allow Variable to route customers to the proper insurance

10  agents.  The [agents] entered into contracts with Variable that specified the days of the week and

11  times in which Variable should make its calls, the geographic location of the customers whom it

12  should call, and the number of calls Variable should transfer to the insurance agency each day.

13  *Smith*, 30 F. Supp. 3d at 775.

14         With respect to the specifically alleged campaign to sell a "Diamond New Car" protection

15  plan, following *Thomas*, Plaintiff can offer no evidence to support Royal having control over the

16  manner and means of a telemarketing campaign for a "Diamond New Car" product.  The most

17  evidence Plaintiffs can present is that AAAP/Precise was a contracted agent of Royal.  However

18  there is no evidence of any agreements, letters, training materials, sales/disbursements reports, or

19  even internal memos, etc, that show Royal had any involvement, much less control, over a

20  Diamond New Car telemarketing campaign.

21         While it is true that deposition and affidavit testimony, agreements, and reports indicate

22  that Royal provided information to AAAP regarding the nature and pricing of the Royal service

23  contracts AAAP <u>was authorized to sell</u> – (i.e., Royal Shield, Sentinel, IAP and PVP plans), there

24  is no evidence to prove that Royal had any control over a telemarketing campaign for a Diamond

25  New Car service contract.  (*See, e.g,* Exhibits 1, 3 & 16, McCabe Affidavit ¶ 13; Pomeroy

26  Affidavit ¶ 11; Wisnaskas Depo. at 29:17-21; and Exhibit 5, Commission Program; Exhibit 6,

27  Royal Contracts Sold by AAAP.)

28

1    Thus, whereas in *Thomas*, the Plaintiff received a text promoting a Taco Bell "Nacho

2    Belle Grande" but evidence failed to show Taco Bell Corporate controlled the text campaign;

3    here, the "Diamond New Car" product cannot be distinguished as a Royal product, and there is no

4    admissible evidence to show Royal controlled or authorized a "Diamond New Car" campaign.

5    Further, whereas telemarketing calls were actually transferred to the State Farm insurance agents

6    based on clear guidelines from State Farm in *Smith*; in this case, no Royal "Diamond New Car"

7    contracts were <u>ever</u> sold by AAAP. Thus, Plaintiffs can offer no evidence of Royal follow-up

8    akin to the transfers to State Farm agents in that case. Here, the call scenario is more like that in

9    *Panacci*, where a general telemarketer made calls that may have mentioned a specific seller. But

10   unlike the explicit mention of solar power seller A1 in some *Panacci* calls, in the instant

11   telemarketing, All American Auto Protection never mentioned Royal or any Royal product in any

12   of the calls to Plaintiffs. The vague references to a "diamond new car" plan are simply too

13   remote to attach vicarious liability to Royal.

14   Because Plaintiff cannot offer any evidence that Royal authorized AAAP to be its agent to

15   sell a "Diamond New Car" plan, and the AAAP calls never identified Royal or Royal products,

16   there is no genuine issue of material fact that AAAP was a formal agent of Royal, thus Plaintiffs'

17   vicarious liability fails to attach as a matter of law.

18                              **b.    Apparent Agency Does Not Apply to the Alleged**

19                                          **Unlawful Telemarketing**

20   Under the federal common law, a principal may be held vicariously liable for a third-

21   party's reliance on a purported agent's unauthorized actions under the apparent authority doctrine,

22   <u>provided that the third party reasonably believes the actor has authority to act on behalf of the</u>

23   <u>principal and that the belief is traceable to the principal's manifestations</u>. *Smith*, 30 F. Supp.3d at

24   777; *See also* Restatement (Third) of Agency § 2.03 cmt. c (Apparent authority holds a principal

25   accountable for the results of third-party beliefs about an actor's authority to act as an agent when

26   the belief is reasonable and is traceable to a manifestation of the principal); *RFF Family*

27   *Partnership, LP, v. Link Development*, LLC 907 F. Supp.2d 155 (D. Mass. 2012).[4] (The conduct

28   ---

[4] The parties Agreements are governed by Massachusetts law. *See* Exhibit 11, at 11.4.

of the principal, and not the agent, creates apparent authority for purposes of the apparent authority doctrine, allowing a principal to be vicariously liable for an agent's unauthorized actions.)

In April 2015 TCPA case *Roylance v. ALG Real Estate Servs., Inc.*, the Northern District of California found evidence of apparent authority when the defendant lender was identified in papers in a loan package shipped to the plaintiff Roylance following a telemarketing call. No. 5:14-CV-02445-PSG, 2015 WL 1522244, at *5 (N.D. Cal. Mar. 16, 2015) *report and recommendation adopted as modified*, No. 14-CV-02445-BLF, 2015 WL 1544229 (N.D. Cal. Apr. 3, 2015). By shipping a loan package to Roylance regarding same mortgage that the prerecorded caller and Mark Augustus offered to Roylance, (refinance at 4.5 percent for thirty years) ALG thus represented to Roylance that the caller had the authority to advertise mortgages for ALG. *Roylance*, at *5. However, in *Smith*, an apparent agency theory failed against insurers Farmers and Nationwide insurance companies because nothing in a prerecorded message suggested Variable was acting as an agent of Nationwide or Farmers. *Smith*, 30 F. Supp. 3d at 778. Apparent agency failed in *Smith* even though the prerecorded message suggests that Variable would help the caller shop around for the best offer from competing defendants State Farm, Nationwide, and Farmers! *Id.*

The instant facts in no way rise to the evidence presented in *Smith* and *Roylance*. No "Diamond New Car" materials were ever sent to the Plaintiffs from Royal or its affiliates like the mortgage package from the Defendant in *Roylance*. And, unlike the message in *Smith*, Royal was never even identified in either phone call to Plaintiffs, so there is no evidence to support a belief by Plaintiffs that AAAP was an agent of Royal. Indeed, Royal was never even identified until discovery began, months after this suit was initiated.

As there is no basis at all for the Plaintiffs to believe that AAAP called them as an agent of Royal, there is no genuine issue of material fact that AAAP was an apparent agent of Royal, thus Plaintiffs' vicarious liability argument based on apparent agency must fail as a matter of law.

1    **c.**   **Ratification Does Not Apply to These Facts**

2    "Ratification is the affirmance of a prior act done by another, whereby the act is given

3 effect as if done by an agent acting with actual authority."  Restatement (Third) of Agency §

4 4.01(1) cited in *Smith*, 30 F. Supp. 3d at 779.  "A principal can ratify an act by (a) manifesting

5 assent that the act shall affect the person's legal relationships, or (b) conduct that justifies a

6 reasonable assumption that the person so consents." *Id.* § 4.01(2). "[K]nowing acceptance of the

7 benefit of a transaction ratifies the act of entering into the transaction." *Id.* § 4.01 cmt. d.

8    The Ninth Circuit has noted, however, that ratification has no meaning without an

9 underlying principal-agent relationship:  "Although a principal is liable when it ratifies an

10 originally unauthorized tort, the principal-agent relationship is still a requisite, and ratification can

11 have no meaning without it."  *Thomas v. Taco Bell Corp.*, 582 Fed. Appx. 678, 679 (9th

12 Cir.2014) (citing *Batzel v. Smith,* 333 F.3d 1018, 1036 (9th Cir. 2003)).

13    Once again, *Smith* is instructive.  The ratification theory of vicarious liability failed

14 against Farmers because none of the *Smith* plaintiffs alleged they spoke to or did business with

15 Farmers or its insurance agents as a result of Variable's calls.  *Smith*, 30 F. Supp. 3d at 779.

16 However, there was sufficient evidence for a ratification theory to go to a jury in *Cin-Q*.  Three

17 waves of fax advertisements identifying the Buccaneers prompted multiple complaints from

18 Tampa residents, and ultimately a cease and desist letter from the Florida Attorney General.  *Cin-*

19 *Q at* \*1-2.  Upon notice of complaints, defendant BLP requested removal of complaining

20 individuals from future waves, but also demanded indemnification language for later waves of

21 faxes as well as legal defense from its telemarketer.  *Id.* at \*8-9.  In denying cross motions for

22 summary judgment the court noted "…evidence in the record could…support the proposition that

23 BLP ratified what it knew to be offending conduct – deciding to turn a blind eye and accept the

24 collateral damage created by its agent's actions, all while hiding behind a promise of indemnity.

25 *Id.* at \*8-9.

26    A finding that Royal ratified the calls AAAP placed to Plaintiffs is inconceivable based

27 upon the facts before the court.  Unlike the insurance companies in *Smith*, Royal was never

28 identified in the calls received by Plaintiffs.  Additionally, Royal never received any inquiries or

26

1  business from the these Plaintiffs regarding the purported "Diamond New Car" protection plan,

2  so a ratification theory of vicarious liability should fail in this court as it did in *Smith*.

3      Certainly there are no facts in this record to assert that Royal turned a blind eye to known

4  offending conduct by AAAP as BLP appeared to do in *Cin-Q*.   BLP's lawyers sought

5  indemnification and legal defense while continuing to authorize future waves of faxes to Tampa

6  residents, whereas Royal wasn't even aware of the alleged "Diamond New Car" protection calls

7  until it received a subpoena in the 2014 suit against AAAP.   Moreover, Royal's express

8  contractual prohibition of DNC violations and robo-dialing, and various, multiple compliance

9  efforts (as detailed supra) tend to show a good faith effort at complying with telemarketing law,

10  rather than ratification of offending conduct.

11      Finally, as noted by the Ninth Circuit in *Thomas*, ratification has no meaning without the

12  requisite principal agent relationship.  Here, to demonstrate the requisite relationship to establish

13  ratification of the "Diamond New Car" telemarketing calls by Royal, Plaintiffs would need proof

14  that AAAP was authorized, trained, or reimbursed for selling Diamond New Car protection plans.

15  No such evidence is available, because the record demonstrates that AAAP was authorized and

16  paid to telemarket Royal Shield, Sentinel, IAP and PVP protection plans only, so a ratification

17  theory is unavailable to Plaintiffs as premised on a "diamond new car protection plan."

18      For these reasons, there is no evidence to create a genuine issue that Royal ratified the

19  alleged unlawful calls made by AAAP to sell a "diamond new car protection plan."   Thus, a

20  vicarious liability argument based on ratification must fail.

21      **D.   "Sabotage" Liability**

22      Some courts have gone so far as to theorize sabotage scenarios where a telemarketer could

23  violate the TCPA with completely unauthorized calls while imposing liability on an unwary

24  business.  *See, e.g., Cin-Q Automobiles*, 2014 WL 7224943 at *6; *Bais Yaakov v. Varitronics,*

25  *LLC*, 2015 U.S. Dist. LEXIS 44016, *10 (D. Minn. Apr. 3, 2015).  Such a situation is not so far-

26  fetched under the instant facts.  Royal fiercely disputes Plaintiffs' allegations that it ever provided

27  a "Diamond New Car" service contract for AAAP to market; Royal offers clear evidence of the

28  four products that were legitimately sold by AAAP: IAP,  PVP, Royal Shield and Sentinel; Royal

1  has shown some of the "diamond plans" offered by its competitors; and yet this entire litigation

2  attempts to make Royal liable for AAAP calls selling "diamond new car" protection.

3      In *Cin-Q* the court imagined an entity could be held *per se* liable merely because their

4  goods and services featured in unlawful telemarketing faxes. *Id.* at *6.  The Court hypothesized

5  that a fan could send an unsolicited fax promoting season tickets on behalf of a franchise football

6  team, without the team's knowledge or approval, giving rise to per se liability for that football

7  team.  *Id.*  In *Cin-Q*, the court further noted the privity of the parties involved in the unlawful

8  telemarketing to be a "tortured path of lies and deceit." *Id.* at *8.

9      Here, the facts show that Royal paid AAAP for just four vehicle service contracts:  IAP,

10  PVP, Royal Shield, and Sentinel.  (Exhibit 5, Royal Contracts Sold by AAAP.)  Despite Royal's

11  best efforts to mandate and monitor compliance in the sales of these four products, it appears that

12  AAAP alone violated several provisions of the TCPA with its calls to Plaintiffs, quite possibly in

13  a sabotage scenario.   Indeed, Royal's trusted, and long-serving call center agent Clayton

14  Churchill testified that AAAP telemarketers were knowledgeable about <u>all</u> the various vehicle

15  warranties in the industry.  (Exhibit 10, Churchill Depo. 46:10-11, 47:20-23.)  Churchill further

16  testified that AAAP didn't make calls on behalf of Royal, instead they called to sell the

17  importance of a customer having any vehicle service contract, then compared available plans

18  offered by various administrators – EFG, Interstate, Royal and others – before matching a

19  customer with the right benefits for their vehicle make, model and mileage. (*Id.*)  Royal President

20  Rich McCabe testified that during his many visits to AAAP, its principals assured him phone lists

21  were "scrubbed" against Do-Not-Call lists, and showed him that people dialed customers one at a

22  time rather than "robo-dialed."  (Exhibit 1, McCabe Affidavit at ¶ 9.)  In other words, Royal

23  made multiple, good faith efforts to ensure compliance in the selling of its authorized products by

24  AAAP, but AAAP was free to make telemarketing calls to sell a host of non-Royal vehicle

25  protection plans.

26      Importantly, unlike the cases cited herein, where defendants' brands and products feature

27  in the calls, AAAP identified <u>only itself</u> as the seller, and provided an AAAP 800 number and

28  website. (FAC at ¶ 8:10-14.)  And the vaguely named "diamond plan" is even offered by Royal's

1  competitors.  (Exhibits 8 & 21.)  Most significant, AAAP made no effort to defend the lawsuit

2  against it, and default was entered against AAAP and its principals, while Plaintiffs force Royal

3  to defend far-fetched allegations.  This is almost the perfect sabotage scenario.

4  **IV.    CONCLUSION**

5      For all the foregoing reasons, Royal respectfully requests that this Court grant this Motion

6  for Summary Judgment in its entirety and dismiss all alleged TCPA violations against Royal, as

7  discussed herein.

8  DATED this 17th day of July, 2015            WILSON ELSER MOSKOWITZ
                                               EDELMAN & DICKER LLP
9

10                                             _____
                                               Richard I. Dreitzer, NV Bar No. 6626
11                                             Amanda L. Ireland, NV Bar No. 13155
                                               300 South Fourth Street, 11th Floor
12                                             Las Vegas, NV  89101
                                               Attorneys for Defendant, ROYAL
13                                             ADMINISTRATION SERVICES, INC.

14                          **CERTIFICATE OF SERVICE**

15      Pursuant to FRCP 5(b), I certify that I am an employee of WILSON, ELSER,

16  MOSKOWITZ, EDELMAN & DICKER LLP and that on this 17th day of July, 2015, I did cause

17  a true copy of the foregoing **DEFENDANT ROYAL ADMINISTRATION, INC.'S MOTION**

18  **FOR SUMMARY JUDGMENT** to be electronically transmitted to the Clerk of the Court using

19  the CM/ECF system for filing.  Based on the records currently on file, the Clerk of the Court will

20  transmit a Notice of Electronic Filing to the following ECF registrants:

21  Peter D. Durney, Esq.                      Matthew Righetti
    DURNEY & BRENNAN, LTD.                     RIGHETTI GLUGOSKI, P.C.
22  190 W. Huffaker Ln., Ste. 406              456 Montgomery St., Ste. 1400
    Reno, NV  89511                            San Francisco, CA  94104
23                                             *Attorneys for Plaintiffs*

24

25

26  BY _____

27     An Employee of
       WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

28

29

810887v.2

## INDEX OF EXHIBITS

| Exhibit | Description | # pages |
|---|---|---|
| 1 | Affidavit of Richard McCabe | 4 |
| 2 | Excerpts from the deposition of Richard McCabe | 10 |
| 3 | Affidavit of Meaghan Pomeroy | 3 |
| 4 | Royal website | 100 |
| 5 | Service Contracts sold by AAAP/Precise from October 28, 20011 to October 13, 2014 | 135 |
| 6 | March 2012 Commission Program Letter | 1 |
| 7 | Training Materials | 35 |
| 8 | Interstate website screenshots | 6 |
| 9 | American Auto Shield website screenshots | 6 |
| 10 | Excerpts from the deposition of Clayton Churchill | 10 |
| 11 | October 2011 Agreements | 10 |
| 12 | Affiliated Party Fee Agreement | 3 |
| 13 | Letter of Understanding | 2 |
| 14 | Guaranty Agreement | 7 |
| 15 | Royal Direct Marketer Standards and Guidelines | 6 |

818877v.1

| 16 | Agreement to Comply with Guidelines and Standards | 7 |
|----|---------------------------------------------------|----|
| 17 | Excerpts from the deposition of Joanne Wisnaskas | 4 |
| 18 | Excerpts from the deposition of Meaghan Pomeroy | 8 |
| 19 | DNC Scrubbing Receipt. | 1 |
| 20 | Distribution Agreement with Buyer's Choice | 10 |