FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHARLES A. JONES; JOSH WATSON, on behalf of themselves and all similarly situated persons,
    *Plaintiffs-Appellants*,

v.

ROYAL ADMINISTRATION SERVICES, INC.,
    *Defendant-Appellee*,

and

ALL AMERICAN AUTO PROTECTION, INC.; HAROUT PAMBUCKCHYAN; RAFFI SADEJYAN; JASON GARCIA,
    *Defendants*.

No. 15-17328

D.C. No.
3:14-cv-00199-LRH-WGC

OPINION

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted June 15, 2017
San Francisco, California

Filed August 9, 2017

Before: Mary M. Schroeder, D. Michael Fisher,[*] and N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith

### SUMMARY[**]

**Telephone Consumer Protection Act**

The panel affirmed the district court's grant of summary judgment in favor of the defendant in an action under the Telephone Consumer Protection Act.

The panel held that Royal Administration Services, Inc., could not be held vicariously liable under the TCPA for several phone calls made by telemarketers employed by All American Auto Protection, Inc., because the telemarketers were independent contractors and therefore did not act as Royal's agents, as defined by federal common law.

---

[*] The Honorable D. Michael Fisher, United States Circuit Judge for the U.S. Court of Appeals for the Third Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Matthew Righetti (argued), John Glugoski, and Michael Righetti, Righetti Glugoski P.C., San Francisco, California, for Plaintiffs-Appellants.

Richard I. Dreitzer (argued) and Donald P. Paradiso, Wilson Elser Moskowitz Edelman & Dicker LLP, Las Vegas, Nevada, for Defendant-Appellee.

**OPINION**

N.R. SMITH, Circuit Judge:

Charles Jones and Josh Watson seek to hold Royal Administration Services, Inc. ("Royal") vicariously liable for several telephone calls made in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, by telemarketers employed by All American Auto Protection, Inc. ("AAAP"). Royal can only be held vicariously liable for these calls if the telemarketers were acting as its agents, as defined by federal common law, when the calls were placed. To determine whether the AAAP telemarketers were Royal's agents or independent contractors, we apply the ten non-exhaustive factors set forth in the Restatement (Second) Of Agency § 220(2) (1958). *Schmidt v. Burlington N. & Santa Fe Ry. Co.*, 605 F.3d 686, 690 (9th Cir. 2010). After an assessment of these factors, we find AAAP's telemarketers were acting as independent contractors rather than as Royal's agents. Therefore, Royal cannot be held vicariously liable for these telephone calls. Accordingly, the district court properly granted summary judgment in Royal's favor.

**I.**

Royal sells vehicle service contracts ("VSC"). A VSC "is a promise to perform (or pay for) certain repairs or services [on an automobile]." *Auto Service Contracts and Warranties*, Fed. Trade Comm'n: Consumer Info., https://www.consumer.ftc.gov/articles/0054-auto-service-contracts-and-warranties (last updated August 2012). A VSC is "[s]ometimes called an 'extended warranty.'" *Id.* Royal sells its VSCs through automobile dealers and through "marketing vendors." These marketing vendors sell Royal's VSCs "through direct mail or telemarketing." Royal sells VSCs through about 20 different marketing vendors.

AAAP sold VSCs for many companies like Royal through telemarketing. When an AAAP telemarketer placed a call, he or she would first "sell the concept of . . . a vehicle service contract" to the consumer. Then, during the phone call, the telemarketer would pick a particular service plan from one of their many vendors to sell to the consumer, based on the make, model, and mileage of the consumer's car, and the price and benefits in which the consumer expressed interest.

In October 2011, Royal entered into a marketing agreement with AAAP.[1] The agreement between Royal and AAAP contained authorized sales and marketing methodologies with which AAAP was required to comply. The agreement "[e]xpressly excluded from these methodologies . . . any act or omission that violates applicable state or Federal law, including but not limited to 'robo-calling.'"

---

[1] At the time AAAP was operating as Precise Enterprises, LLC.

Royal assigned Clayton Churchill to be the "agent of record" for the AAAP account. Churchill provided training to AAAP's employees at AAAP's call center in Azusa, California. During this training, he provided information about Royal's VSCs, claim structure, coverage, pricing, and customer service. Royal's president, Richard McCabe, visited the call center with Churchill about a dozen times from 2011 to 2014. During these visits, AAAP's officials (Harout Pambuchchyan, Raffi Sadejyan, and Jason Garcia)[2] provided assurances that the telemarketers were "dialing customers one at a time" and that they were "compl[ying] with the Do Not Call list."

Appellants are individuals living in Reno, Nevada, whose cellular telephone numbers are registered on the national do-not-call registry. Jones asserts that he received four calls on his cellular telephone from AAAP in March 2014. During one of these calls, Jones spoke to Charlie Fort, who offered to sell Jones a VSC called the "Diamond New Car" protection plan. Jones was then transferred to Samuel Morris, who confirmed that he was calling from AAAP. Watson asserts that he received four calls to his cellular telephone from AAAP in April and May of 2014. Jones and Watson believe AAAP placed the calls using an "automatic telephone dialing system."

In April 2014, Jones filed a class-action law suit against AAAP, Pambuckchyan, Sadejyan, and Garcia, asserting one claim for violation of the TCPA. AAAP was originally represented by counsel and filed an answer and a motion to

---

[2] It is not clear from the record what positions these three individuals held at AAAP. They have been called officers, directors, employees, and principals in both the record and briefs.

dismiss. However, AAAP's attorneys all moved to withdraw after AAAP terminated "its attorneys due to an anticipated bankruptcy action by [AAAP]." The district court granted the motions to withdraw. On January 8, 2015, after the district court and AAAP's former attorneys had repeatedly advised the company that it was "obligat[ed] to defend this action through licensed counsel," the district court entered default against AAAP, because it had failed to "otherwise defend" this action.

Thereafter, the district court granted Jones leave to file an amended complaint. In the First Amended Complaint, Jones added Watson as a plaintiff and Royal as a defendant. The First Amended Complaint asserted that Royal was vicariously liable for AAAP's calls that were made in violation of the TCPA and the federal regulations implementing the TCPA. On June 17, 2015, Royal filed a motion for summary judgment. On November 24, 2015, the district court granted the motion and entered judgment in favor of Royal. This appeal followed.

## II.

The Ninth Circuit reviews de novo a district court's grant of summary judgment. *Pavoni v. Chrysler Grp., LLC*, 789 F.3d 1095, 1098 (9th Cir. 2015). In analyzing a motion for summary judgment, the panel must "must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Within this analysis, the panel must "[v]iew[] the evidence 'as a whole' and 'in the light most favorable to the party opposing the motion.'" *Id.* (quoting *Matsushita*, 475 U.S. at 587). "An

issue of material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### III.

The TCPA makes it unlawful for a person,

> to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice
>
> . . .
>
> to any telephone number assigned to a . . . cellular telephone service . . . or any service for which the called party is charged for the call . . . .

47 U.S.C. § 227(b)(1)(A)(iii). One of the parties to the call (either the caller or the recipient) must be "within the United States." § 227(b)(1). The TCPA also directed the Federal Communications Commission ("FCC") to "prescribe regulations to implement methods and procedures for protecting the privacy rights [of consumers]." § 227(c)(2). The TCPA gives consumers "who ha[ve] received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the[se] regulations" a private right of action. § 227(c)(5). The regulations implementing the TCPA prohibit, among other things, a "person or entity" from "initiat[ing] any telephone solicitation

to . . . [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry." 47 C.F.R. § 64.1200(c)(2).

Royal does not challenge whether there is sufficient evidence in the record to create a genuine issue of material fact as to whether AAAP's telemarketers violated the TCPA and its implementing regulations. Rather, Royal disputes whether it can be held vicariously liable for AAAP's calls.

We have previously clarified that "a defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller." *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 878 (9th Cir. 2014), *aff'd sub nom. Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 674 (2016) ("[U]nder federal common-law principles of agency, there is vicarious liability for TCPA violations."). "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Mavrix Photographs, LLC v. LiveJournal, Inc.*, 853 F.3d 1020, 1029 (9th Cir. 2017) (quoting Restatement (Third) Of Agency § 1.01 (Am. Law Inst. 2006)). "For an agency relationship to exist, an agent must have authority to act on behalf of the principal and '[t]he person represented [must have] a right to control the actions of the agent.'" *Id.* (quoting Restatement (Third) Of Agency § 1.01 cmt. c). One theory of agency, actual authority, "arises through 'the principal's assent that the agent take action on the principal's

behalf.'"[3]  *Id.* (quoting Restatement (Third) Of Agency § 3.01). "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) Of Agency § 2.01.

Significantly, "[n]ot all relationships in which one person provides services to another satisfy the definition of agency." *Id.* § 1.01. An individual acting as an "independent contractor," rather than an agent, does not have the traditional agency relationship with the principal necessary for vicarious liability. *See United States v. Bonds*, 608 F.3d 495, 505–06 (9th Cir. 2010). Generally, a principal is not vicariously liable for the actions of an independent contractor, because the principal does not have sufficient control over an independent contractor. *Id.*; *see also Mavrix Photographs*, 853 F.3d at 1030 (citing *Hollingsworth v. Perry*, — U.S. —, 133 S. Ct. 2652, 2657–58 (2013)); *Bonds*, 608 F.3d at 505 (holding that, in determining whether an agency relationship exists, "a court will look to the totality of the circumstances, but the 'essential ingredient . . . is the extent of control exercised by the employer'").

Keeping in mind that the "extent of control exercised by the [principal]" is the "essential ingredient," *Bonds*, 608 F.3d at 505, we adopt the following ten factors as relevant to the

---

[3] The district court analyzed whether Royal could be vicariously liable under three different agency theories: actual authority, apparent authority, and ratification. On appeal, Appellants assert that they are only pursuing an actual authority theory, and have waived any argument under the other two theories. Accordingly, we address only actual authority.

determination of whether an individual providing services for a principal is an agent or an independent contractor:

> 1) the control exerted by the employer, 2) whether the one employed is engaged in a distinct occupation, 3) whether the work is normally done under the supervision of an employer, 4) the skill required, 5) whether the employer supplies tools and instrumentalities [and the place of work], 6) the length of time employed, 7) whether payment is by time or by the job, 8) whether the work is in the regular business of the employer, 9) the subjective intent of the parties, and 10) whether the employer is or is not in business.

*Id.* at 504 (citing Restatement (Second) Of Agency § 220(2) (1958)). These factors are not exhaustive, but they guide our analysis here. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989) (citing Restatement (Second) Of Agency § 220(2) and listing additional factors, none of which "is determinative," that should be considering in deciding "whether a hired party is an employee under the general common law of agency"). Applying these factors, we find AAAP and its telemarketers were not acting as Royal's agents when they placed the calls at issue in this case.

First, we acknowledge that Royal exercised some amount of control over AAAP. AAAP was required to keep records of its interactions with consumers who purchased Royal VSCs, give Royal weekly reports on VSC sales, and provide notice of requests to cancel Royal VSCs. AAAP was also required to implement security measures to protect consumer

information, collect payments on behalf of Royal, and obtain Royal's approval before using sales literature to assist in the sale of Royal VSCs. Moreover, AAAP was only permitted to use the "scripts and materials" Royal approved and had to comply with the "guidelines and procedures" Royal provided when selling Royal products. These guidelines and procedures generally required AAAP to "operate in accordance with laws and regulations" and refrain from making "false and misleading" representations. In fact, Royal suspended its relationship with AAAP on one occasion after it suspected AAAP telemarketers were violating Royal's standards and procedures. However, Royal did not have the right to control the hours the telemarketers worked nor did it set quotas for the number of calls or sales the telemarketers had to make. *See N.L.R.B. v. United Ins. Co. of Am.*, 390 U.S. 254, 258 (1968) (finding the fact that individuals "perform their work primarily away from the company's offices and fix their own hours of work and work days" showed principal had less control and supported independent contractor status). Thus, Royal had only limited control of AAAP's telemarketers.

Significantly, Royal did not have any control of a telemarketer's call until the telemarketer decided to pitch a Royal VSC to the consumer. AAAP sold VSCs for multiple companies (all of whom, presumably, had their own standards and procedures AAAP telemarketers were required to comply with). When an AAAP telemarketer reached a consumer, they first had to sell the consumer on the idea of a VSC. Royal did not have control over this sales pitch. Only after the consumer was sold on the idea of a VSC, would an AAAP telemarketer pitch a specific VSC. If this specific VSC was a Royal VSC, then Royal controlled the "scripts and materials" the telemarketer was permitted to use in the sale.

An AAAP telemarketer pitched a VSC to Appellants during only one call at issue in this case. During that call, a telemarketer attempted to sell a "Diamond New Car" protection plan—a plan not sold by Royal through AAAP. Thus, there is no evidence that AAAP telemarketers ever tried to sell Royal VSCs to Appellants. Accordingly, Royal never specifically controlled any part of any of the calls at issue in this case.

Second, AAAP was an independent business, separate and apart from Royal, *see id.* at 258–59 (finding relevant whether individuals "operate[d] their own independent businesses" or "perform[ed] functions that are an essential part of the company's normal operations"), and it was engaged in the "distinct occupation" of selling VSCs through telemarketing, as demonstrated by the fact that it "had many different clients and offered [the same] services to others during the same period," *see Bonds*, 608 F.3d at 505.; *cf. Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 995 (9th Cir. 2014) (applying California law, which considers nearly identical factors). Thus, this factor strongly suggests AAAP's telemarketers were independent contractors rather than employees.

Third, the calls made by AAAP's telemarketers were not normally done under the supervision of Royal. Churchill provided some training and oversight at AAAP's Azusa call center, and Richard McCabe, Royal's president, visited the call center about a dozen times over the course of three years. However, as evidenced above, a Royal employee did not directly supervise AAAP's calls. Therefore, this factor also favors finding AAAP's telemarketers were independent contractors.

As to the fourth factor, the record does not contain any evidence regarding the skill required to place the calls or sell a VSC. Therefore, we do not consider this factor in our analysis.

Fifth, Royal provided AAAP with some "tools and instrumentalities" necessary to complete the sales. For example, Royal provided the contracts that were to be sold and gave AAAP access to their "on-line Contract quote manager." Royal also trained the AAAP telemarketers in how to sell Royal contracts. On the other hand, AAAP provided far more tools and instrumentalities, including its own phones, computers, furniture, and office space. In addition, if AAAP wanted any "brochures [or] other sales literature," it had to develop and manufacture them itself. Thus, AAAP supplied most of the "tools and instrumentalities," further supporting a finding of independent contractor status. *See Reid*, 490 U.S. at 752.

Sixth, the original contract was in effect for only one year, with each party retaining the ability to cancel the contract at any time on 30 days notice. Ultimately, AAAP sold VSCs for Royal for three years, from October 2011 until October 2014. Three years is not a particularly short period of time, but the limited nature of the original contract shows there was a "contemplated end to the . . . relationship." *See Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1105 (9th Cir. 2014). The designated impermanency of the relationship supports a finding of independent contractor status. *See N.L.R.B.*, 390 U.S. at 259 (finding relevant that individuals had "a permanent working arrangement with the company under which they may continue as long as their performance is satisfactory"); *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947).

Seventh, AAAP was paid a commission for each sale, rather than for the time the telemarketers worked. This is a strong indicator that the telemarketers were independent contractors. *See Ruiz*, 754 F.3d at 1104–05; *Bonds*, 608 F.3d at 505.

Eighth, Royal specifically contracted out all its direct sales to many different vendors and car dealerships instead of hiring its own employees to sell its VSCs. However, Royal is in the business of selling VSCs; accordingly, AAAP's sales are a regular part of Royal's business. Thus, this factor tends to favor finding an agency relationship. *See Ruiz*, 754 F.3d at 1105.

As to the ninth factor, the record does not clearly evidence the subjective intent of the parties. Nevertheless, the fact that AAAP sold VSCs for multiple companies indicates that AAAP's intent was to have its telemarketers operate as independent contractors for many different companies. *See Dumas v. Gommerman*, 865 F.2d 1093, 1105 (9th Cir. 1989) (finding relevant "whether the artist works for several buyers at a time, or exclusively for one").

Tenth, and finally, Royal is a business, which favors finding an agency relationship.

Taking these factors into account, it is clear that AAAP's telemarketers were independent contractors rather than agents. AAAP was its own independent business that sold VSCs for multiple companies without the direct supervision of a Royal employee. AAAP provided its own equipment, set its own hours, and only received payment if one of its telemarketers actually made a sale. Finally, although Royal had some control over AAAP's telemarketers, it did not

specifically control the calls at issue in this case, because the telemarketers never attempted to sell a Royal VSC during those calls. Because AAAP's telemarketers were independent contractors, rather than Royal's agents, Royal cannot be held vicariously liable for any calls the telemarketers made in violation of the TCPA.

## IV.

The district court correctly applied the relevant substantive law to the undisputed facts when it concluded that the AAAP telemarketers were not acting as Royal's agents when they placed the calls and, accordingly, that Royal could not be held vicariously liable for the calls. Because Royal cannot be held vicariously liable for the calls, it was proper for the district court to grant Royal's motion for summary judgment.

**AFFIRMED.**